No. 23-1428

In The
### United States Court of Appeals for the Federal Circuit

EGENERA, INC.,

*Plaintiff-Appellant,*

*v.*

CISCO SYSTEMS, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:16-cv-11613-RGS, Hon. Richard G. Stearns

**RESPONSE BRIEF OF
APPELLEE CISCO SYSTEMS, INC.**

Tamir Packin
John M. Desmarais
DESMARAIS LLP
230 Park Avenue
New York, NY  10169

Elizabeth R. Moulton
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

Mark S. Davies
Upnit Bhatti
Katherine M. Kopp
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

James Anglin Flynn
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
222 Berkeley Street
Boston, MA  02116

*Counsel for Appellee*

## REPRESENTATIVE CLAIM LANGUAGE AT ISSUE

## U.S. Patent No. 7,231,430, Claim 1

1. A platform for automatically deploying at least one virtual processing area network, in response to software commands, said platform comprising:

a plurality of computer processors connected to an internal communication network;

at least one control node in communication with an external communication network and in communication with an external storage network having an external storage address space, wherein the at least one control node is connected to the internal communication network and thereby in communication with the plurality of computer processors, said at least one control node including logic to receive messages from the plurality of computer processors, wherein said received messages are addressed to the external communication network and to the external storage network and said at least one control node including logic to modify said received messages to transmit said modified messages to the external communication network and to the external storage network;

configuration logic for receiving and responding to said software commands, said software commands specifying (i) a number of processors for a virtual processing area network (ii) a virtual local area network topology defining interconnectivity and switching functionality among the specified processors of the virtual processing area network, and (iii) a virtual storage space for the virtual processing area network, said configuration logic including logic to select, under programmatic control, a corresponding set of computer processors from the plurality of computer processors, to program said corresponding set of computer processors and the internal communication network to establish the specified virtual local area network topology, and to program the at least one control node to define a virtual storage space for the virtual processing area network, said virtual storage space having a defined correspondence to a subset of the external storage address space of the external storage network; and

wherein the plurality of computer processors and the at least one control node include network emulation logic to emulate Ethernet functionality over the internal communication network.

**U.S. Patent No. 7,231,430, Claim 3**

3. A platform for automatically deploying at least one virtual processing area network, in response to software commands, said platform comprising:

a plurality of computer processors connected to an internal communication network;

at least one control node in communication with an external communication network and in communication with an external storage network having an external storage address space. wherein the at least one control node is connected to the internal communication network and thereby in communication with the plurality of computer processors, said at least one control node including logic to receive messages from the plurality of computer processors, wherein said received messages are addressed to the external communication network and to the external storage network and said at least one control node including logic to modify said received messages to transmit said modified messages to the external communication network and to the external storage network;

configuration logic for receiving and responding to said software commands, said software commands specifying (i) a number of processors for a virtual processing area network (ii) a virtual local area network topology defining interconnectivity and switching functionality among the specified processors of the virtual processing area network, and (iii) a virtual storage space for the virtual processing area network, said configuration logic including logic to select, under programmatic control, a corresponding set of computer processors from the plurality of computer processors, to program said corresponding set of computer processors and the internal communication network to establish the specified virtual local area network topology, and to program the at least one control node to define a virtual storage space for the virtual processing area network, said virtual storage space having a defined correspondence to a subset of the external storage address space of the external storage network;

wherein the at least one control node receives, via the internal communication network, storage messages from said corresponding set of computer processors, and wherein the at least one control node includes logic to extract an address from a received storage message, to identify the defined corresponding address in the external storage address space, and to provide messages on the external storage

network corresponding to the received storage messages and having the corresponding address; and

wherein the at least one control node includes logic to buffer data corresponding to write messages received from a computer processor of said corresponding set of computer processors and to provide the buffered data in the corresponding message provided to the external storage network.

## U.S. Patent No. 7,231,430, Claim 5

5. A method of automatically deploying at least one virtual processing area network, in response to software commands, said method comprising the acts of:

    providing a platform having a plurality of computer processors and at least one control node connected to an internal communication network, wherein the at least one control node is in communication with an external communication network and an external storage network having an external storage address space;

    receiving software commands specifying (i) a number of processors for a virtual processing area network, (ii) a virtual local area network topology defining interconnectivity and switching functionality among the specified processors of the virtual processing area network, and (iii) virtual storage space for the virtual processing area network;

    under programmatic control and in response to the software commands, selecting a corresponding set of computer processors for the virtual processing area network;

    under programmatic control and in response to the software commands, programming said corresponding set of computer processor; and the internal communication network to establish the specified virtual local area network topology providing communication among said corresponding set of computer processors but excluding the processors from the plurality not in said set;

    under programmatic control and in response to the software commands, programming the at least one control node to define a virtual storage space of the virtual processing network, said virtual storage space having a defined correspondence to a subset of the external storage address space of the external storage network;

    wherein messages from the plurality of computer processors to the external communication network and to the external storage network are received and modified by the least one control node which transmits the modified messages to the external communication network and to the external storage network; and

    wherein the plurality of computer processors and the at least one control node emulate Ethernet functionality over the internal communication network.

### U.S. Patent No. 7,231,430, Claim 7

7. A method of automatically deploying at least one virtual processing area network, in response to software commands, said method comprising the acts of:

> providing a platform having a plurality of computer processors and at least one control node connected to an internal communication network, wherein the at least one control node is in communication with an external communication network and an external storage network having an external storage address space;

> receiving software commands specifying (i) a number of processors for a virtual processing area network, (ii) a virtual local area network topology defining interconnectivity and switching functionality among the specified processors of the virtual processing area network, and (iii) virtual storage space for the virtual processing area network;

> under programmatic control and in response to the software commands, selecting a corresponding set of computer processors for the virtual processing area network;

> under programmatic control and in response to the software commands, programming said corresponding set of computer processor; and the internal communication network to establish the specified virtual local area network topology providing communication among said corresponding set of computer processors but excluding the processors from the plurality not in said set;

> under programmatic control and in response to the software commands, programming the at least one control node to define a virtual storage space of the virtual processing network, said virtual storage space having a defined correspondence to a subset of the external storage address space of the external storage network;

> wherein messages from the plurality of computer processors to the external communication network and to the external storage network are received and modified by the least one control node, which transmits the modified messages to the external communication network and to the external storage network;

> wherein the at least one control node receives, via the internal communication network, storage messages from said corresponding set of computer processors, axed wherein the at least one control node extracts am address from a received storage message, identifies the defined corresponding address in the external storage address space, and provides messages on the external storage network

corresponding to the received storage messages and having the corresponding address; and

wherein the at least one control node buffers data corresponding to write messages received from a computer processor of said corresponding set of computer processors and provides the buffered data in the corresponding message provided to the external storage network.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 23-1428 |
| **Short Case Caption** | Egenera, Inc. v. Cisco Systems, Inc. |
| **Filing Party/Entity** | Cisco Systems, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/03/2023

Signature: /s/ Mark S. Davies

Name: Mark S. Davies

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Cisco Systems, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

viii

FORM 9. Certificate of Interest                    Form 9 (p. 3)
**March 2023**

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable        ☑    Additional pages attached

| | | |
|---|---|---|
| See Attached | | |
| | | |
| | | |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Attachment

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Desmarais LLP: Jonas R. McDavit; Jamie L. Kringstein; Carson Olsheski; Peter C. Magic; Michael R. Rhodes; Lindsey E. Miller; Paul A. Bondor; Brian Leary (no longer with firm); Elizabeth Weyl (no longer with firm); Robert C. Harrits (no longer with firm); Ryan T. Lawson (no longer with firm); William Findlay (no longer with firm); David O'Steen (no longer with firm)

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.: Patrick E. McDonough

Freeman Mathis & Gary LLP: Kevin G. Kenneally; Thomas K. McCraw, Jr.; William E. Gildea (no longer with firm)

LeClairRyan: John W. Moran (no longer with firm)

# TABLE OF CONTENTS

**Page**

REPRESENTATIVE CLAIM LANGUAGE AT ISSUE ............................. i

CERTIFICATE OF INTEREST ............................................... vii

TABLE OF AUTHORITIES .................................................. xiii

STATEMENT OF RELATED CASES ..................................... xix

INTRODUCTION .............................................................. 1

STATEMENT OF THE ISSUES ............................................ 3

STATEMENT OF THE CASE .............................................. 3

    The computer-networking industry births a cable nightmare. ............... 3

    Cisco's UCS provides a ground-breaking new tool for virtualizing
        local area networks. ................................................ 6

    Egenera's BladeFrame fails. ........................................... 7

    Egenera obtains the '430 patent. .................................... 10

    Egenera sues Cisco for infringement of the '430 patent. ............... 13

    The jury rejects all of Egenera's remaining claims of infringement ....... 18

    The district court denies Egenera's motion for a new trial. ............ 18

SUMMARY OF ARGUMENT ............................................... 20

STANDARD OF REVIEW ................................................... 23

ARGUMENT ................................................................. 25

    I.    The District Court Correctly Granted Summary Judgment
        on Claims 1 and 5. ................................................ 25

    II.    The District Court Correctly Denied Judgment as a Matter
        of Law on Claims 3 and 7. ....................................... 32

        A.    Sufficient evidence supports the finding that UCS does
            not program processors to establish network topology. ...... 33

        B.    Sufficient evidence supports the finding that UCS does
            not modify messages. ........................................ 38

        C.    Sufficient evidence supports the finding that UCS does
            not identify and extract addresses. ........................... 40

D.      Egenera failed to identify structures corresponding to claim 3's means-plus-function limitations.......................... 43

III.    The District Court Correctly Denied a New Trial. ..................... 44

A.      The district court did not abuse its discretion in denying a new trial based on the weight of the evidence. ............... 45

B.      The district court did not err in denying a new trial based on the jury instructions. ......................................... 47

1.      The district court did not abuse its discretion in rejecting Egenera's untimely request for a curative instruction on infringement. .................................... 47

2.      The district court did not err in refusing Egenera's instruction on separate patentability. ...................... 49

C.      The district court did not abuse its discretion in denying a new trial based on Cisco's lay opinion testimony. .......... 53

1.      The district court did not abuse its discretion in finding that Egenera's objections to Cisco's lay opinion testimony are waived................................. 54

2.      Egenera's objection to Cisco's lay opinion testimony is meritless............................................. 59

3.      Egenera was not prejudiced by Cisco's lay opinion testimony. ......................................................... 61

D.      The district court did not abuse its discretion in denying a new trial based on Cisco's closing arguments................. 62

1.      The district court did not abuse its discretion in finding that Egenera's objections to Cisco's closing arguments are waived. ........................................... 62

2.      Egenera's objections to Cisco's closing arguments are meritless. ....................................................... 63

3.      Egenera was not prejudiced by Cisco's closing arguments. .......................................................... 67

CONCLUSION.......................................................................... 68

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
  334 F.3d 1343 (Fed. Cir. 2003)................................................................. 32

*AbbVie Deutschland GmbH v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014)................................................. 23, 24, 25

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
  811 F.3d 1334 (Fed. Cir. 2016)................................................................. 26

*Anheuser-Busch, Inc. v. Nat'l Beverage Distribs.*,
  69 F.3d 337 (9th Cir. 1995) ....................................................................... 65

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
  448 F.3d 1324 (Fed. Cir. 2006)................................................................. 43

*Bennett v. City of Holyoke*,
  362 F.3d 1 (1st Cir. 2004)........................................................................... 44

*Bose Corp. v. SDI Techs., Inc.*,
  558 F. App'x 1012 (Fed. Cir. 2014) ......................................................... 31

*Cohesive Techs., Inc. v. Waters Corp.*,
  543 F.3d 1351 (Fed. Cir. 2008)................................................................. 23

*Comcast IP Holdings I LLC v. Sprint Commc'ns Co.*,
  850 F.3d 1302 (Fed. Cir. 2017)................................................................. 27

*Commil USA, LLC v. Cisco Systems, Inc.*,
  720 F.3d 1361 (Fed. Cir. 2013)..........................................................67, 68

*CommScope Techs. LLC v. Dali Wireless Inc.*,
  10 F.4th 1289 (Fed. Cir. 2021) .........................................................34, 41

*Comput. Sys. Eng'g, Inc. v. Qantel Corp.*,
  740 F.2d 59 (1st Cir. 1984)......................................................................... 62

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
   460 F.3d 1349 (Fed. Cir. 2006) .................................................... 36

*Cordis Corp. v. Boston Sci. Corp.*,
   658 F.3d 1347 (Fed. Cir. 2011) .................................................... 32

*Crowe v. Bolduc*,
   334 F.3d 124 (1st Cir. 2003) ....................................................... 58

*Crowley v. L.L. Bean, Inc.*,
   303 F.3d 387 (1st Cir. 2002) ....................................................... 24

*Diaz-Fonseca v. Puerto Rico*,
   451 F.3d 13 (1st Cir. 2006) ......................................................... 44

*Dimanche v. Mass. Bay Transp. Auth.*,
   893 F.3d 1 (1st Cir. 2018) ........................................................... 45

*Egenera, Inc. v. Cisco Sys., Inc.*,
   972 F.3d 1367 (Fed. Cir. 2020) ............................................. 12, 14

*Elliott v. S.D. Warren Co.*,
   134 F.3d 1 (1st Cir. 1998) ........................................................... 50

*Embrex, Inc. v. Serv. Eng'g Corp.*,
   216 F.3d 1343 (Fed. Cir. 2000) .................................................. 36

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012) .................................................... 27

*Frappier v. Countrywide Home Loans, Inc.*,
   750 F.3d 91 (1st Cir. 2014) ................................................... 24, 45

*Fusco v. Gen. Motors Corp.*,
   11 F.3d 259 (1st Cir. 1993) ......................................................... 57

*Garcia v. Peery*,
   No. EDCV 12-01641-JGB (DTB), 2015 WL 5159279
   (C.D. Cal. July 8, 2015) .............................................................. 48

*Glaros v. H.H. Robertson Co.*,
   797 F.2d 1564 (Fed. Cir. 1986) .................................................. 52

*Holden v. United States,*
  388 F.2d 240 (1st Cir. 1968) .................................................. 54

*IDC Props., Inc. v. Chicago Title Ins. Co.,*
  42 F.4th 1 (1st Cir. 2022) ...................................................... 63

*Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.,*
  849 F.3d 355 (7th Cir. 2017) ................................................. 59

*Jennings v. Jones,*
  587 F.3d 430 (1st Cir. 2009) ................................................. 24

*Ji v. Bose Corp.,*
  626 F.3d 116 (1st Cir. 2010) ............................................51, 61

*McDonald v. Town of Brookline,*
  863 F.3d 57 (1st Cir. 2017) ................................................... 25

*Me. Green Party v. Maine,*
  173 F.3d 1 (1st Cir. 1999) ..................................................... 29

*Milo & Gabby LLC v. Amazon.com, Inc.,*
  693 F. App'x 879 (Fed. Cir. 2017) ........................................ 29

*NFA Corp. v. Asheboro Elastics Corp.,*
  230 F.3d 1377, 2000 WL 6217 (Fed. Cir. 2000)..................... 51

*Omega Patents, LLC v. CalAmp Corp.,*
  920 F.3d 1337 (Fed. Cir. 2019)................................. 55, 57, 60

*OneBeacon Am. Ins. v. Comm. Union Assurance Co. of Can.,*
  684 F.3d 237 (1st Cir. 2012) ................................................. 23

*Polansky v. CNA Ins. Co.,*
  852 F.2d 626 (1st Cir. 1988) ................................................. 67

*Ramos v. Davis & Geck, Inc.,*
  167 F.3d 727 (1st Cir. 1999) ................................................. 67

*Reagan v. Brock,*
  628 F.2d 721 (1st Cir. 1980) ................................................. 54

*Saville v. United States,*
  400 F.2d 397 (1st Cir. 1968) ................................................... 54

*Shafmaster v. United States,*
  707 F.3d 130 (1st Cir. 2013) ................................................... 31

*Shepp v. Uehlinger,*
  775 F.2d 452 (1st Cir. 1985) ................................................... 54

*Shervin v. Partners Healthcare Sys., Inc.,*
  804 F.3d 23 (1st Cir. 2015) ...............................................24, 25

*SiOnyx LLC v. Hamamatsu Photonics K.K.,*
  981 F.3d 1339 (Fed. Cir. 2020) ............................................... 23

*Smith & Nephew, Inc. v. Ethicon, Inc.,*
  276 F.3d 1304 (Fed. Cir. 2001) ............................................... 40

*Snuba Int'l, Inc. v. Dolphin World, Inc.,*
  No. 99-1357, 2000 WL 961363 (Fed. Cir. July 11, 2000) ...................... 32

*Thomas & Betts Corp. v. New Albertson's, Inc.,*
  915 F.3d 36 (1st Cir. 2019) ................................................... 44

*Torres v. KMart Corp.,*
  233 F. Supp. 2d 273 (D.P.R. 2002) ............................................ 50

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.,*
  699 F.3d 1340 (Fed. Cir. 2012) ............................................... 32

*UCB, Inc. v. Watson Labs., Inc.,*
  927 F.3d 1272 (Fed. Cir. 2019) ............................................... 42

*Uniloc USA, Inc. v. Microsoft Corp.,*
  632 F.3d 1292 (Fed. Cir. 2011) ............................................... 58

*Union Pac. Res. Co. v. Chesapeake Energy Corp.,*
  236 F.3d 684 (Fed. Cir. 2001) ................................................ 60

*United States v. Amador-Huggins,*
  799 F.3d 124 (1st Cir. 2015) ................................................. 49

*United States v. Belanger,*
   890 F.3d 13 (1st Cir. 2018) ..................................................... 60

*United States v. DeStefano,*
   59 F.3d 1 (1st Cir. 1995) ........................................................ 51

*United States v. Gilbert,*
   229 F.3d 15 (1st Cir. 2000) ..................................................... 63

*United States v. McGill,*
   953 F.2d 10 (1st Cir. 1992) ..................................................... 50

*Vasquez v. Frauenheim,*
   No. 2:13-cv-01497-JKS, 2014 WL 4249676 (E.D. Cal. Aug. 26, 2014) ..... 48

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.,*
   853 F.3d 1272 (Fed. Cir. 2017) ............................................... 37

*Wi-LAN, Inc. v. Apple Inc.,*
   811 F.3d 455 (Fed. Cir. 2016) ............................................ 37, 42

*Willco Kuwait (Trading) S.A.K. v. deSavary,*
   843 F.2d 618 (1st Cir. 1988) ............................................. 55, 62

*Zenith Labs., Inc. v. Bristol-Myers Squibb Co.,*
   19 F.3d 1418 (Fed. Cir. 1994) ................................................ 41

## Statutes

35 U.S.C. § 112(f) .................................................................. 12

## Rules and Regulations

Fed. R. Civ. P. 32(a)(4) .......................................................... 63

Fed. R. Civ. P. 50(a)(1) .......................................................... 23

Fed. R. Civ. P. 103(a) ............................................................ 58

Fed. R. Evid. 103(a)(1) ........................................................... 54

Fed. R. Evid. 701 ............................................................. 60, 61

Fed. R. Evid. 702 ................................................................. 61

## Other Authorities

*Emulate*, Oxford English Dictionary (updated online through
    March 2023)........................................................................... 26

*Emulation*, A Dictionary of Computing (6th ed. 2008)................................. 27

*Network Topology*, Newton's Telecom Dictionary (24th ed. 2008)................. 16

*Network Topology*, Wiley Electrical and Electronics Engineering
    Dictionary (1st ed. 2004)......................................................... 16

The Patent Process: An Overview for Jurors,
    https://www.youtube.com/watch?v=ax7QHQTbKQE .......................... 48

## STATEMENT OF RELATED CASES

A prior appeal in this matter was before this Court in *Egenera Inc. v. Cisco Systems, Inc.*, Nos. 19-2015, -2387.  The Court issued a decision in that appeal on August 28, 2020, authored by then-Chief Judge Prost, joined by Judges Reyna and Stoll, and reported at 972 F.3d 1367 (Fed. Cir. 2020).

# INTRODUCTION

By the 1990s, the typical computer server room had become a logistical nightmare: an expensive mess of networking cables full of potential failure points.  When a new or replacement server was needed for a particular purpose, a person had to go with a screwdriver to install it and connect it to the relevant networks.  There was no ready way to respond to the changing demands of a modern business—e.g., no way to repurpose a server from processing payroll to processing emails without moving and re-cabling the server itself.

Responding to these industry problems, Cisco deployed a new way of running a network.  It applied the well-known concept of virtualization, using software commands to replicate the function of what had previously been hardware.  This eliminated the excess cables and streamlined the process of grouping computer servers into networks.  Cisco's product called Unified Computing System (UCS) came to dominate the market after it was released in 2009.

Meanwhile, Egenera had developed a virtualization solution to networking of its own, making several design choices that led to a plague of bugs and delays—and persistent customer dissatisfaction.  Egenera obtained U.S. Patent No. 7,231,430 in 2005 and had developed a product embodying

that technology called the BladeFrame.  By 2008, however, Egenera was being hounded by competitors, its hardware revenue plummeted, and it discontinued sales of the BladeFrame.

Years later, burned by its failure in the market, Egenera set its sights on Cisco, alleging that UCS infringes the '430 patent.  Egenera's case crumbled at trial.  Despite proclaiming a tale of rampant copying, Egenera produced not a shred of evidence that Cisco copied anything of Egenera's.  And it utterly failed to respond to Cisco's powerful evidence that UCS uses a fundamentally different design than the '430 patent.  The jury sided with Cisco and rendered a verdict of non-infringement.

Now, Egenera passes the blame for its failures of proof.  The jurors acted irrationally, or else the district court did.  But the record is rich with evidentiary support for the district court's summary-judgment resolution as to claims 1 and 5, as well as the jury's non-infringement verdict as to claims 3 and 7.  As for the procedural and evidentiary challenges Egenera raises, it is telling how many of them went unpreserved.  The Court should reject Egenera's attempt to serve up such errors retroactively on appeal.

## STATEMENT OF THE ISSUES

1.  Whether there was a genuine dispute that the UCS processors do not emulate Ethernet functionality, and therefore the district court correctly granted summary judgment of noninfringement as to claims 1 and 5.

2.  Whether there was sufficient evidence (a) that UCS does not program processors to establish network topology, (b) that UCS does not modify messages from processors to the external communication network, or (c) that UCS does not extract an address from and identify a corresponding address for messages from processors to the external storage network, and therefore the district court correctly denied Egenera's motion for judgment as a matter of law.

3.  Whether the district court correctly denied Egenera's new trial arguments, including those that it waived in the district court.

## STATEMENT OF THE CASE

*The computer-networking industry births a cable nightmare.*

By the year 2000, the need for networked computing power had reached all-time highs.  Data centers, where companies house their computing and networking hardware, had become a Frankenstein of servers, network switches, storage, and more—plus all the cables to connect them to each other:



Appx15115; *see also* Appx12919.

The above images show the physical cabling required to link different servers together. A server is "a computer just like your laptop," except "beefier." Appx12923. Each server contains one or more processors (or "CPUs"), which are the "brains" of the server, i.e., the computing powerhouses. Appx12754. Like any computer, a server might contain a variety of other components, including fans to control heat, power supplies, and local memory. Appx12750-12751.

One of those components, the network interface card (NIC), enables the server to communicate with the network of other servers. Appx12299. Servers can be grouped together into local area networks (LANs) to supply computing

power for various business tasks. *See* Appx12923-12926. The servers are linked together by switches, which are the "interconnection engine" of the network. Appx12923. At the heart of the network are devices (sometimes referred to as "control nodes") that establish and manage the network of servers and interface with other networks, like the Internet or external data storage. *See* Appx12555-12557.

In the old hardware-centric model, servers could be grouped together into LANs by cabling them together through the same switch. Appx12925-12926. Achieving these LANs by physical cables and dedicated switches was a time-intensive and expensive process. As business demands changed, you might need to increase or decrease the computing power available on a given LAN. If you needed an extra server to accommodate increased demand for processing payroll, for instance, you would have needed to physically relocate an underused server and cable it into the payroll network. Appx12156; Appx12926. That reconfiguration was extremely difficult. Appx12156; Appx12295-12297; Appx12919. It was "a very manual, time-consuming physical process," and "if you have to change anything, you've got to go do that all over again." Appx12156. Maintenance was likewise an enormous, expensive hassle: Imagine trying to identify a single faulty cable or connector

in the rat's nests above.  Appx12157; Appx12919.  "It's just impossible."
Appx12157.

Before Egenera was even founded, computer scientists looked for ways
to solve these cabling problems.  And in the ensuing decade, a possible
solution emerged: Virtualization, or the process of representing in software a
virtual version of what had previously been a hardware device.  Appx12158.
In a common example, the virtual fax machine, the sender transmits a message
to a normal fax number, but the recipient receives the message printed on the
screen—virtually—when it would previously have been printed on hard copy.
Software in the computer is performing the tasks of the old hardware fax
machine.  This approach can "enable a whole level of sophistication and
capability that you wouldn't have with … physical devices."  Appx12158.

### *Cisco's UCS provides a ground-breaking new tool for virtualizing local area networks.*

Cisco is an innovative provider of critical technology and security
solutions.  It is a leader in enterprise server technology and is the world's
largest enterprise security company.

Cisco sought ways to overcome the networking problems just described.
It developed the Unified Computing System (UCS) to virtualize many of the
components in a data center.  In Cisco's UCS product, servers are connected
through a single switch (or "switch fabric") and are pooled together by

software rather than hardware.  These networks of servers create a virtual

LAN (VLAN).  Appx12927.  The "beauty of VLANs" is that "because they're

not physical, … you can change the configuration" with a simple command

"in software" rather than re-configuring the physical hardware.  Appx12928.

UCS used custom-designed network interface cards which could each be

configured to create multiple virtual NICs (VNICs), which were then in turn

used to create virtual networks among the physical servers.  *See* Appx12875-

12877; Appx12954-12956.

Since its launch in 2009, Cisco's UCS has been a hit.  *See* Appx14535-

14536.  By one metric, in 2016, UCS had grown to $3.5 billion in revenues

annually.  Appx14780.  "[I]n a short time, [Cisco] became the number one

market share in the United States for blade servers."  Appx14826.

**Egenera's BladeFrame fails.**

Egenera also developed a data center virtualization tool called the

BladeFrame.  In BladeFrame (and UCS), the servers are called blade servers,

because they are flat boards that slide in and out of their enclosures.

Appx12923-12924.  In both the BladeFrame and the '430 patent, Egenera took

"a fundamentally different design philosophy" than Cisco and decided to pool

*processors* instead of *servers.*  Appx12956; Appx12944.

This design choice involved a consequential trade-off: First, Egenera's approach had some advantages over Cisco's approach. If "a single [processor] fails," Egenera's system could "recover" by identifying another available processor within the network and assigning it the failed processor's address. Appx12949; *accord* Appx115 (27:45-28:17). In other words, when one of a server's processors fails, the other still-functioning processors on that server can continue to operate on the network. *See* Appx12956-12958. Under Cisco's server-by-server approach, by contrast, a failed processor requires the substitution of a whole new server (or else the hardware replacement of the failed processor). Appx12956-12958. And in Egenera's system, the processors inside a single server could be split amongst different VLANS, something that wasn't possible with the UCS's server-by-server approach. *See* Appx12949-12950.

But second, Egenera's approach came at a substantial cost: Because Egenera pooled individual processors, it needed to program each of those processors with the software necessary to establish the VLANs. Appx12952. That meant that Egenera had to write "drivers," which are software programs, that would modify the operating systems (e.g., Microsoft Windows) that ran on the processors—an expensive, difficult, and time-consuming task. *See* Appx12364-12365; Appx12978-12979. And it meant that every time Microsoft

updated its operating system, Egenera had to troubleshoot its drivers. Appx14658-14661.  Indeed, the inability to accomplish that task timely and adequately led to what one Egenera employee called "big driver fiasco[es]" for customers—situations where drivers were delayed or failed to work. Appx12369; *see also* Appx12370-12372.  By contrast, because Cisco pools whole servers, it programs the VLAN-establishing software on Cisco NICs, thereby avoiding the pitfalls of modifying the processors' operating systems. *See* Appx12817-12818; Appx12956-12957.  That meant "higher reliability[] and higher serviceability" for the customer.  Appx12817.

The BladeFrame also had another major shortcoming: It used the Giganet protocol internally rather than Ethernet, Appx12234, and it therefore needed to emulate Ethernet functionality to communicate externally to the Ethernet-dominated technological landscape, *see, e.g.*, Appx12807-12808; Appx115 (28:36-48) (explaining that "us[ing] an internal Ethernet fabric … would simplify much of the architecture").  Customers "did not like that kind of architecture."  Appx12808.  Among other problems, the BladeFrame's use of Giganet required "at least ten times as much" bandwidth as Cisco's UCS. Appx12889.

Egenera's BladeFrame met with some initial success in the market and received some innovation awards.  *E.g.*, Appx14654-14655.  Between 2002 and

2004, there was "dramatic growth" in Egenera's product revenues, from $12 million in 2002 to $65 million in 2004.  Appx12254-12255.

But then the dramatic growth slowed: In 2005 BladeFrame yielded only $68 million in product revenue, and in April of that year Egenera canceled a planned initial public offering of its stock.  Appx12257-12258.  Against the backdrop of customer reliability complaints and increased competition from legacy providers like IBM and Hewlett Packard, Egenera's product sales peaked in 2006 and cratered thereafter.  *See* Appx12271; Appx12258-12259; Appx12420.  Eventually, Egenera discontinued the BladeFrame—indeed, its hardware efforts entirely—and "transition[ed] to a software-only company."  Appx12472-12473.

Egenera was not alone.  At least one other company in the market took Egenera's approach, requiring complex modifications to the processors' operating systems, and similarly failed.  *See* Appx12803-12804 ("The companies that took that approach … are they big players in the server market today?  No, not anymore.").

**Egenera obtains the '430 patent.**

Egenera did not invent virtualization and did not invent VLANs—they were "widely used before Egenera."  Appx12929.  Instead, Egenera sought a patent on a narrow implementation of these concepts in 2002, disclosing and

claiming its chosen processor-by-processor approach.  *See* Appx86.  Egenera

obtained the '430 patent in 2007.  *See* Appx86.  Figure 1 shows one

embodiment:



Appx15121 (Egenera's shading added to Appx88 (Fig.1)).

In this figure, each purple processing node 105 contains one or more

processors (CPUs) 106 and one or more network interface cards (NICs) 107,

which are "how you would typically connect to a network."  Appx12299.  The

processing nodes communicate among one another using the green switch

fabric 115.  Appx12165; Appx12920-12921.  And that switch fabric is also connected to one or more red control nodes 120, which run the software that manages the network.  Appx12165-12166.  The control nodes are connected to a yellow external communication network (like the Internet) and to a blue external storage network (which houses the system's data).  *See generally* Appx102-103 (2:65-3:37).

In the BladeFrame, the processing node was a blade server.  *See* Appx12298-12299.  The blade servers communicated through switches with software called the "PAN Manager," i.e., the control node, which ran on its own blade and "manage[d] the virtualization" and server "provisioning," among other tasks.  Appx12165-12166.

As relevant here, independent claims 1 and 3 recite "platform[s] for automatically deploying at least one virtual processing area network," by pooling processors as described above (at 7-9).  Appx115 (28:63-64); Appx116 (29:41-42).  Independent claims 5 and 7 recite related "method[s] of automatically deploying at least one virtual processing area network." Appx117 (31:18-19); Appx117 (31:65-66).  The district court (and, in a prior appeal, this Court) concluded that claims 1 and 3 contain "logic to" terms that amount to means-plus-function limitations under 35 U.S.C. § 112(f).  *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1372-76 (Fed. Cir. 2020).

*Egenera sues Cisco for infringement of the '430 patent.*

In 2016, Egenera filed suit against Cisco, alleging that UCS infringes the '430 patent (among others no longer at issue). Appx189-192. Following a bench trial on inventorship, the district court initially resolved the case on the ground that the '430 patent was invalid for failure to name all of the inventors. Appx8478-8513. In doing so, the district court concluded that Egenera's entire team of inventors was not credible, rejecting their "post-hoc protestations" about inventorship in favor of the "[c]ontemporaneous records" that debunked their testimony. Appx8512.

At claim construction, the parties disputed whether the '430 patent's use of the terms "processor" and "computer processor" should be construed to mean individual CPUs within a server (Cisco's position) or to mean whole servers that can contain multiple CPUs (Egenera's position). *See* Appx1239-1244. Egenera's construction would have swept in all the components of a server, including NICs; that was strategic for Egenera because it would have captured all of the functionality housed in UCS's NICs, as opposed to its processors alone. But the district court disagreed with Egenera, adopting Cisco's view that "'computer processor' w[ould] be accorded its ordinary meaning of 'CPU.'" Appx1244.

In the first appeal in this case, this Court affirmed the district court's challenged claim constructions but concluded that the district court had misapplied judicial estoppel in its inventorship analysis. *Egenera*, 972 F.3d 1367. As noted above (at 12), in that prior appeal, this Court affirmed the district court's conclusion that claims 1 and 3's "logic to" terms are means-plus-function limitations. *Id.* at 1372-76.

Following the first appeal, the case proceeded to summary judgment. As relevant here, the district court granted partial summary judgment of non-infringement in Cisco's favor on claims 1 and 5 of the '430 patent. Appx48-49.

At issue was a limitation in each claim requiring that the processors "emulate Ethernet functionality over the internal communication network" (or have "logic to emulate" that functionality). Appx116 (29:35-38); Appx117 (31:58-60). For summary-judgment purposes, Cisco did not dispute Egenera's allegation that UCS emulates Ethernet functionality. But Cisco explained that that the alleged emulation occurs on the *NICs and interfaces*, not the *processors*. Appx48. As the district court explained, the "role" of UCS processors is limited to "knowledge and use of the virtual MAC address (and other related information)." Appx49 (quoting Appx5224). Because the processors' role involves knowledge and use of the alleged emulated Ethernet functionality—

14

but not the emulation itself—the district court concluded that no reasonable jury could find UCS infringes claims 1 and 5.  Appx49.

The case proceeded to trial on claims 3 and 7, which are related system and method claims for Egenera's virtualization solution.  Appx116 (29:41-30:28); Appx117 (31:65-32:54).

At trial, Egenera alleged that UCS's accused processing nodes are its servers, its accused internal communication network is a component called the "fabric extenders," and its accused control nodes are a component called the "fabric interconnect."  *E.g.*, Appx12642.  In defense of the infringement allegations, Cisco identified three limitations common to the claims that are not met by UCS: the "program the processors" limitation, the "modify the messages" limitation, and the "addresses" limitation.  *E.g.*, Appx12966-12968; Appx12983; Appx13002-13003.  As the district court instructed, if any one of those limitations was not met, the jury was required to find in Cisco's favor on infringement.  Appx15042.

**Program the processors.**  First, the asserted claims both require that the accused product "program[] said corresponding set of computer processor[s] …

to establish the specified virtual local area network topology." Appx117 (32:19-23); *accord* Appx116 (30:4-7).[1]

Cisco agreed that UCS establishes a local area network topology, but it explained that UCS only programs the NICs—and not the processors—to establish that topology. *E.g.*, Appx12973-12983. As explained above (at 7-9), this design choice represented a fundamentally different approach to virtualizing LANs than the approach in claims 3 and 7.

**Modify the messages.** Second, the asserted claims require that "messages from the plurality of computer processors to the external communication network … are received and modified by the [at] least one control node." Appx117 (32:33-36); *accord* Appx116 (29:57-59). In other words, the patent teaches that a message transmitted by a processor, bound for an external network like the Internet, is modified by the control node from what was originally sent by the processor. *See* Appx13004-13005.

Egenera contended that the infringing modification in UCS is the addition and removal of a field known as the VN-Tag by the fabric

---

[1] "Network topology" means the "geography of the network," i.e., the "geometric arrangement of links and nodes of a network." *Network Topology*, Newton's Telecom Dictionary (24th ed. 2008); *accord Network Topology*, Wiley Electrical and Electronics Engineering Dictionary (1st ed. 2004) ("the arrangement of nodes and their interconnections"). As explained above (at 6-7), UCS takes a server-by-server approach to VLANs, meaning that the nodes are the servers rather than (as in the '430 patent) the processors.

interconnect (i.e., the control node). *See* OB38-39. Cisco agreed that the fabric interconnect removes the VN-Tag from messages, but it pointed out that there is no VN-Tag in the messages when they are sent by the processors; instead, that tag is added along the way by the virtualized NICs. *E.g.*, Appx13006-13008. So in UCS, "the message that actually goes out" from the fabric interconnect "is exactly the same as the message that came from the [processor]"—i.e., it is unmodified. Appx13008.

**Addresses.** Third, the asserted claims both require that when a message is transmitted by the processors and bound for the external storage, the control node "extracts a[n] address from [that] received storage message" and "identifies the defined corresponding address in the external storage address space." Appx117 (32:42-45); *accord* Appx116 (30:16-19). In other words, the control node translates the address provided by the processor into the corresponding address recognizable by the external storage. *See* Appx12983-12985.

Egenera contended that the infringing addresses are two fields known as the VLAN ID and VSAN ID. *See* OB42. But Cisco contended that this infringement allegation fails at the outset, because the VLAN ID and VSAN ID are not addresses at all (nor the equivalent); rather, they are fields commonly referred to as "tags." *See* Appx12987-12989.

17

***The jury rejects all of Egenera's remaining claims of infringement.***

The jury rendered a unanimous verdict of non-infringement.  *See*

Appx12012-12016; Appx15080-15082.  The district court thereafter denied

Egenera's motions for judgment as a matter of law and for a new trial,

Appx77-84, and entered judgment for Cisco on non-infringement, as well as

judgment for Egenera on Cisco's claim of invalidity, Appx85.

***The district court denies Egenera's motion for a new trial.***

As just noted, after verdict, Egenera moved for a new trial based on the

weight of the evidence, claimed instructional and evidentiary errors, and

allegedly improper comments made during Cisco's closing argument.

Appx13404-13405.

As for the claimed instructional errors, Egenera argued, as it does on

appeal, that the trial court erred by (1) refusing to instruct the jury that a

patented product may still infringe another patent and (2) erroneously

instructing the jury that infringement requires copying and (according to

Egenera) failing to cure that error.  Appx13423-13431.

As for the claimed evidentiary errors, Egenera alleged that Cisco

"elicited expansive non-infringement opinions from two Cisco lay witnesses"

that "far exceeded what is allowed under *Omega*" and that those witnesses

acted as "surprise expert witnesses."  Appx13418-13419.  Egenera complained

that Cisco's lay witnesses "directly addressed and disputed expert testimony given by Egenera's expert;" "opined that Cisco's litigation-generated 'bedrock fact number three,' directed at non-infringement, was true in its entirety;" and "covered doctrine of equivalents issues." Appx13420. Egenera disputed that this testimony was "for the limited purpose" of defending against its allegations of "willful and induced infringement," and was instead "improper expert testimony" used as "direct evidence of non-infringement." Appx13421.

Egenera also alleged that Cisco's closing arguments violated four of the district court's pretrial orders:

1. the "empty chair" prohibition;

2. the court's litigation-finance order;

3. the court's order prohibiting Cisco "from referring to Egenera as a non-practicing entity or a patent troll"; and

4. the court's order prohibiting "any arguments … that non-practicing entities bring baseless claims."

Appx13414-13416.

The district court denied Egenera's motion for a new trial in its entirety. The court found that its instructions were sufficient and that its comment about copying was not a formal instruction that required a targeted curative instruction. Appx82-83. The court also found that Egenera had waived its

objections to testimony from two lay Cisco witnesses (Mr. Dvorkin and Mr. Jayakrishnan) "by failing to raise any relevant objection during the examination of either witness." Appx81. It also held that Egenera could not show prejudice because Egenera itself "opened the door to the testimony … by asking [Mr. Jayakrishnan] about the '430 patent." Appx81-82. The district court also found that Egenera had "fail[ed] to object to the alleged improper [closing] arguments," no "plain error occurred," and "even if the alleged errors were plain, Egenera has not shown that any of them was prejudicial." Appx79-81.

## SUMMARY OF ARGUMENT

**I.** The district court correctly granted summary judgment of non-infringement as to claims 1 and 5. Those claims require that the accused processors "emulate Ethernet functionality." Egenera failed to proffer evidence that would allow a reasonable jury to find that UCS's processors satisfy that limitation. Rather, the UCS processors use the alleged emulated Ethernet functionality that is established by other system components (like network interface cards and switches).

**II.** The district court correctly denied Egenera's motion for judgment as a matter of law as to claims 3 and 7. That denial must be affirmed if sufficient

evidence supported non-infringement as to any one of the disputed limitations, described in turn below:

First, sufficient evidence supported the jury's finding that UCS does not "program[] … [its] processor[s] … to establish the specified virtual local area network topology." Rather, UCS programs its network interface cards—and only those cards—to establish its network topology.

Second, sufficient evidence supported the jury's finding that "messages from the … computer processors" are not "received and modified by the [at] least one control node." Rather, UCS's control node transmits those messages exactly as they were when sent by the processors.

Third, sufficient evidence supported the jury's finding that UCS's control node does not "extract a[n] address" from "received storage message[s]" and "identif[y] the defined corresponding address." The fields accused by Egenera were not addresses at all—neither literally nor under the doctrine of equivalents—and Egenera's theory of infringement therefore failed at the outset.

**III.** The district court correctly denied Egenera's motion for a new trial.

First, Egenera failed to show that the weight of the evidence favored overturning the jury's verdict—for the same reasons that it failed to establish

infringement as a matter of law.  The evidence supported the verdict and undercut Egenera's infringement case.

Second, Egenera's contention that a curative instruction was needed to correct the district court's isolated pretrial comment about infringement and copying is baseless.  Egenera did not object to that comment until the last day of trial, and by then, the district court had provided the jury with the correct instruction and again correctly instructed the jury in its final jury instructions. Egenera's argument about its request for an instruction concerning Cisco's references to Cisco's own patents is meritless, as the district court's instructions as a whole accurately summarized the relevant law and, even assuming some error, Egenera was not prejudiced.

Third, Egenera is not entitled to a new trial based on the testimony provided by Cisco's lay witnesses.  Egenera failed to timely object to that testimony, and it is too late to do so now.  Moreover, the testimony that Egenera complains about was entirely appropriate, both because Egenera elicited the testimony and because it was proper lay opinion testimony.  And even if the testimony blurred the line between lay and expert testimony, Egenera was not prejudiced in any way.

Fourth, Egenera is not entitled to a new trial based on Cisco's closing arguments.  Egenera presents a grab bag of allegedly improper statements that

it claims were in violation of the district court's orders in limine. But Egenera failed to object contemporaneously to any of these statements. And none of Cisco's statements were improper or in violation of the court's orders, nor did they prejudice Egenera.

### STANDARD OF REVIEW

This Court reviews summary-judgment rulings de novo. *AbbVie Deutschland GmbH v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1295 (Fed. Cir. 2014) (citing *OneBeacon Am. Ins. v. Comm. Union Assurance Co. of Can.*, 684 F.3d 237, 241 (1st Cir. 2012)).

This Court reviews the denial of judgment as a matter of law de novo, "construing the facts in the light most favorable to the jury verdict and drawing any inferences in favor of the non-movant." *SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1345 (Fed. Cir. 2020) (First Circuit law). The Court considers whether the evidence was "legally sufficient," Fed. R. Civ. P. 50(a)(1), i.e., whether the evidence, when viewed in that light, "would permit a reasonable jury to find in favor of [the non-movant] on any permissible claim or theory," *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1362 (Fed. Cir. 2008) (First Circuit law). This analysis "is weighted toward preservation of the jury verdict." *SiOnyx*, 981 F.3d at 1345 (quoting *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 393 (1st Cir. 2002)).

The Court reviews for abuse of discretion the district court's denial of a motion for new trial based on the weight of the evidence or on claimed evidentiary error. *See AbbVie*, 759 F.3d at 1302 (First Circuit law); *Frappier v. Countrywide Home Loans, Inc.*, 750 F.3d 91, 99 (1st Cir. 2014).[2] With respect to evidentiary errors, the Court also asks "whether the error was harmless," i.e., whether it "affected plaintiff's substantial rights." *AbbVie*, 759 F.3d at 1302.

The First Circuit applies varying standards of review to claimed instructional errors depending on the nature of the error. Here, there are two asserted errors of two different natures. First, the Court reviews for abuse of discretion the assertion that the district court's infringement instructions erred in the "particular wording chosen to convey a concept to the jury." *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 47 (1st Cir. 2015). Second, the assertion that the district court erred in refusing a proposed instruction on separate patentability is reviewed de novo, and the analysis proceeds in two parts: It asks first "whether the requested instruction was correct as a matter of law" and second whether "the omitted instruction is integral to an important part of the case and [whether the instruction's] content is not otherwise

---

[2] Egenera's citation to *Jennings* (at OB46) is not to the contrary. The quoted language describes the standard applied by *the district court* and—right afterward—confirms that appellate review is for "abuse of discretion." *Jennings v. Jones*, 587 F.3d 430, 439 (1st Cir. 2009).

substantially covered by the instructions as given." *Id.* In reviewing these claimed instructional errors, the Court "examine[s] the [district] court's instructions as a whole, rather than reviewing fragments in isolation." *Id.* With respect to both the claimed instructional errors, the First Circuit would reverse only if the error "was prejudicial when evaluating the record as a whole." *McDonald v. Town of Brookline*, 863 F.3d 57, 64 (1st Cir. 2017); *accord AbbVie*, 759 F.3d at 1302.

## ARGUMENT

### I.     The District Court Correctly Granted Summary Judgment on Claims 1 and 5.

**a.** The district court correctly found that Egenera had failed to raise a genuine dispute that the UCS processors meet the claim 1 and claim 5 limitation that requires that the accused "processors … emulate Ethernet functionality over the internal communication network" or "include logic" to so emulate. Appx117 (31:58-60); Appx116 (29:35-38). As the district court explained, Egenera "identifie[d] no evidence that the [processors] in the UCS provide any aspect of the functionality of an Ethernet network," i.e., there was no evidence of the processors doing any of the required emulating. Appx49. Instead, Egenera offered evidence showing at most that the UCS processors *use* the alleged emulated Ethernet functionality, but as the district court correctly

concluded, "knowledge and use of a communications network is not emulation of the functionality of that network." Appx49.

The district court's assessment of the evidence was accurate: In opposition to summary judgment, Egenera argued that its evidence showed—at most—the UCS processors' use of emulated Ethernet functionality. *See* Appx5221-5225. According to Egenera, the processors' "communications on (and uses of) these virtual interfaces satisfy the CPU-related Ethernet emulation functionality required in the claims." Appx5222. But without any evidence that the UCS processors provide the alleged "emulate[d] Ethernet functionality"—rather than merely using it—Egenera could not prove this limitation infringed. Accordingly, no reasonable jury could have found infringement, and summary judgment was warranted. *E.g.*, *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1341 (Fed. Cir. 2016) (affirming summary judgment of non-infringement in the absence of evidence that "every limitation recited in the claim is found in the accused device").

**b.** Insofar as Egenera now contends that mere use of Ethernet functionality is tantamount to emulation, that is wrong because *use* of emulated Ethernet functionality is a wholly different concept from *emulation* of that functionality. *See, e.g.*, *Emulate*, Oxford English Dictionary (updated online through March 2023) ("[t]o reproduce the action of or behave like (a

different type of computer) with the aid of hardware or software designed to effect this"); *Emulation*, A Dictionary of Computing (6th ed. 2008) ("accepting the identical data and producing the identical results"). Indeed, Egenera's briefing itself concedes this point by drawing a distinction between "mere[] *use* of the virtual Ethernet" and "creat[ing] the desired network." OB33.

Egenera's argument on appeal seeks to generate a genuine dispute of fact by improperly rewriting the claims. In other words, Egenera is "essentially [proffering] a claim construction argument … in the guise of a challenge to the sufficiency of the evidence." *Comcast IP Holdings I LLC v. Sprint Commc'ns Co.*, 850 F.3d 1302, 1311 (Fed. Cir. 2017) (first alteration in *Comcast*) (quoting *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012)). But Egenera never sought its desired construction below, nor did it argue that any construction dispute should foreclose summary judgment. Indeed, Egenera did seek a construction of "emulate Ethernet functionality," but Egenera's arguments focused on an entirely different issue from whether emulation could be construed to mean "use." *See* Appx1259-1260 (dispute over whether a network that had Ethernet communications could also "emulate" Ethernet communication). Egenera cannot now leverage a construction it never sought to concoct a factual dispute where there is none.

27

Egenera's resort to the '430 patent's specification gets it nowhere. Egenera argues that the "specification clearly describe[d] [processors] *communicating* over an emulated Ethernet network and characterizes that communication as 'emulat[ing] switched Ethernet semantics.'"  OB35 (quoting Appx103 (3:62-63)).  There are two independently fatal flaws to Egenera's attempt to equate communicating with emulating.

First, nothing in the specification equates mere communication with emulation.  Indeed, in the very sentence Egenera quotes, the specification clarifies that the processor nodes emulate *if* there is "software logic executing" on those nodes—not merely if they communicate by using software logic executing elsewhere.  *See* OB34 (quoting Appx103 (3:60-63)).  In other words, mere communication is insufficient.

Second, the quoted passage does not even refer to the processors specifically.  Rather, it refers to the "processor nodes," which under the district court's unchallenged claim-construction reasoning equates to the servers—including the NICs and the processors—not the individual processors themselves.  Appx1243-1244.

**c.**  To the extent Egenera now argues that the UCS processors "do not merely *use* the virtual Ethernet; they help to create the desired network," OB33, that view is both waived and wrong.  First, it is waived because it

28

represents a "material shift" from Egenera's summary-judgment position. *Me. Green Party v. Maine*, 173 F.3d 1, 5 (1st Cir. 1999) (applying waiver given "a material shift in a factual position" from that taken at summary judgment (emphasis omitted)); *see also Milo & Gabby LLC v. Amazon.com, Inc.*, 693 F. App'x 879, 884 & n.3 (Fed. Cir. 2017) (non-precedential) (collecting cases). Egenera contended in the district court only that use of emulated Ethernet functionality satisfied the claims. Appx5222 ("The UCS Server CPU communications on (and uses of) these virtual interfaces satisfy the CPU-related Ethernet emulation functionality required in the claims.").[3] Now, Egenera materially shifts its argument on appeal, contending instead that the UCS processors "do not merely *use* the virtual Ethernet; they help to create the desired network." OB33. First Circuit law forecloses this kind of gamesmanship on appeal. *Maine*, 173 F.3d at 5.

Second, Egenera's waived argument is wrong. Egenera argues that the UCS processors emulate Ethernet functionality because they are aware of the virtual MAC addresses assigned to their corresponding VNICs. OB33-34; *see also* Appx5223 ("A part of the virtual interface functionality is the assignment

---

[3] *See also id.* ("UCS Adapters are a conduit of emulation-related information to the CPUs and are used by the CPUs to communicate with UCS Fabric Interconnects."); Appx5224 ("The CPU's knowledge and use of the virtual MAC address (and other related information) over the virtual interface is reflected in the image below….").

of a virtual MAC address—an identity—to each vNIC at the UCS server.").
Egenera contends, without citation, that "Ethernet emulation cannot occur
without the assignment of the MAC addresses to the CPUs."  OB34.

To start, MAC addresses are not even assigned to the UCS processors at
all.  *E.g.*, Appx12871; Appx12877.  The assignment takes place at the VNIC—
and that creates the emulated functionality.  No expert contends otherwise.
Indeed, Egenera's expert asserted that the "vNICs and related interfaces
emulate Ethernet functionality," without mentioning any role for the
processors in that emulation.  Appx4127 (¶ 211).  And those VNICS, which
perform the alleged emulation, undisputedly reside on UCS's NICs, not on its
processors.  Appx12760-12761; Appx12880; Appx12955; Appx13203.
Regardless, even if MAC addresses were assigned to processors, it is
undisputed that the processors are merely *aware of* the MAC addresses assigned
to the VNICs, they do not do any of the assigning of addresses or constructing
of the network themselves.  Appx5224 (citing the processors' "knowledge and
use of the virtual MAC address").

Egenera's argument in this respect parallels its similarly flawed argument
with respect to the "program the processors" limitation that was at issue at trial
with respect to claims 3 and 7.  *See infra* § II.A.  In both cases, Egenera points
to the assignment of MAC addresses as establishing infringement.  OB33-34;

OB36-38.  But in both cases, that assignment is made to the VNIC; the processors are merely aware of and use those addresses.  In neither case has Egenera identified evidence that the UCS *processors* meet the relevant limitations.  Its failure to do so requires affirmance of the district court's grant of summary judgment.

**d.**  Finally, even if the Court agrees with Egenera that there was evidence of the processors performing alleged Ethernet emulation, the Court should nevertheless affirm summary judgment of non-infringement on claims 1 and 5.  *See Bose Corp. v. SDI Techs., Inc.*, 558 F. App'x 1012, 1022 (Fed. Cir. 2014) (non-precedential) ("We may affirm on any basis apparent in the record." (quoting *Shafmaster v. United States*, 707 F.3d 130, 135 (1st Cir. 2013)).  The claims dismissed at summary judgment—claims 1 and 5—both contain two of the three limitations found not infringed at trial (namely, the "program the processors" and "modify the messages" limitations).  Appx116 (29:1-43); Appx117 (31:38-57).  Had claims 1 and 5 proceeded to trial, the jury would necessarily have found non-infringement of claims 1 and 5 pursuant to the same findings that defeated claims 3 and 7 at trial.

## II.    The District Court Correctly Denied Judgment as a Matter of Law on Claims 3 and 7.

At trial, Cisco focused on three grounds for non-infringement—three separate patent claim limitations Cisco argued to the jury were not met by UCS.  The jury's general verdict cemented those disputed issues as factual findings in Cisco's favor.  *See, e.g.*, *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012) ("In determining whether a jury's finding is supported by substantial evidence, 'we must presume that the jury resolved all factual disputes in favor of the prevailing party.'" (quoting *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011)).

On appeal, Egenera must therefore establish that the jury lacked sufficient evidence for *all three* of these findings.  In other words, the Court "must sustain the judgment of noninfringement as to an asserted claim if any one of the noninfringement findings as to that claim … is supported by substantial evidence."  *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1349 (Fed. Cir. 2003).[4]  If the Court concludes that the jury had sufficient

---

[4] Egenera's citation (at OB45) to the non-precedential decision in *Snuba* is not to the contrary.  There, following a general verdict, this Court reversed only because the plaintiff-appellant had successfully shown that insufficient evidence supported non-infringement on *every one* of the disputed claim terms. *Snuba Int'l, Inc. v. Dolphin World, Inc.*, 250 F.3d 761, 2000 WL 961363, at *3-8 (Fed. Cir. 2000) (non-precedential).

evidence to support even a single one of these findings, it should affirm the denial of judgment as a matter of law as to claims 3 and 7, and it need not reach the other findings.

### A.    Sufficient evidence supports the finding that UCS does not program processors to establish network topology.

Egenera first challenges the jury's finding that UCS does not "program the processors."  The claims at issue require that UCS "program[] said corresponding set of computer processor[s] … to establish the specified virtual local area network topology."  Appx117 (32:19-22); *accord* Appx116 (30:4-7).

Cisco's non-infringement position is straightforward: to establish the network topology, UCS programs the NICs—*only the NICs*—and not the processors.  The dispute on appeal is about that last part.  Egenera agrees with the first proposition, i.e., that UCS programs the NICs to establish the network topology.  But it contends that UCS *also* programs the processors to establish the network topology.  *See* OB36-38.

The jury correctly rejected that view, and its finding was supported by sufficient evidence.  Once UCS programs the VNICs on the physical network interface cards, the network topology is established, and nothing needs to be (or is) done to the processors.  The Court need look no further than Egenera's own expert, Dr. Jones, who explained:

33

> The *programming of the [UCS] VNIC* creates a virtual relationship between the VNIC that we're looking at through the FX and IOM … to the fabric interconnect. … *This programming establishes the virtual local area topology specified in the claim.*

Appx13204 (emphases added). Put simply, programming the VNIC establishes the network topology.

Cisco's witnesses agreed, explaining that UCS does not "program the processors to establish the network topology," Appx12968; *accord* Appx12982, and that the VNIC "*is* the network topology," Appx12875 (emphasis added); *accord* Appx12881; Appx12974-12976. The jury was entitled to credit that testimony. *E.g.*, *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1300 (Fed. Cir. 2021).

Egenera points to two actions by UCS that it contends amount to "programing the processors." First, it argues that the processors are "loaded with … MAC addresses." OB36. But that is contradicted by the trial testimony: The "loading" action Egenera refers to is merely the processor asking the VNIC what the *VNIC's* MAC address is. Appx12871; Appx12877. The UCS processors do not even have MAC addresses. Appx12871. Receiving that information about the VNIC from the VNIC does not "mean that the [processor] is programmed with the network topology." Appx12877.

Second, Egenera argues that the processors are programmed because they are "loaded with drivers." OB36. But Egenera does not point to a shred of evidence that the processors are loaded with drivers *to establish network topology*. Instead, it cites evidence that the drivers are necessary for the processors to communicate with one another. OB36-38. The processors communicating with one another is *use* of the network topology, *see supra* at 26-27; by the time it comes to that, the topology has already been established by programming the NICs, *see, e.g.*, Appx13204 (Egenera's expert report explaining that the "programming of the VNIC" "establishes the virtual local area topology specified in the claim").

It made sense that Cisco would establish its network topology in this "fundamentally different way" than the '430 patent. Appx12974; *see also supra* at 6-9. Egenera's claimed approach—programming the processors—created numerous technological challenges, which ultimately led to the BladeFrame's failure in the marketplace. Appx12881; *accord id.* ("The more software you have to run on the CPUs … the more complicated it can be."). As a result of its distinct design, UCS "did not have the kind of problems Egenera had" with malfunctions on the processors and customer frustration. Appx12882; *see also supra* at 8-9.

Egenera argues that the district court's emphasis on the "to establish" claim term was an improper, belated construction that incorrectly imported an "intent" limitation into the claim. OB37. But the issue Egenera raises on appeal does not relate in any way to Cisco's intent to infringe or not to infringe; it concerns the plain language of a claim term that requires a particular action (programming) to accomplish a particular goal (establishing network topology). Egenera's citation to the concurring opinion in *Embrex* is inapposite. *See* OB37. That opinion states only that infringement cannot be excused because the defendant intended "experimental use" of the invention. *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1353 (Fed. Cir. 2000) (per curiam) (Rader, J., concurring).

Moreover, there was no belated construction. Like the jury, the district court relied on and applied the plain meaning of an express limitation in Egenera's claim—"to establish the specified virtual local area network topology." It is Egenera who is seeking a belated construction, insisting without citation to any evidence that "there is no network topology until the CPUs can communicate with each other." OB37.

Egenera did not seek such a construction from the district court, and the Court should reject Egenera's retroactive construction efforts. *E.g.*, *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1358 (Fed. Cir. 2006) ("Thus, a

party may not introduce new claim construction arguments on appeal….").
*Wi-LAN* favors the same result. *Wi-LAN, Inc. v. Apple Inc.*, 811 F.3d 455, 465
(Fed. Cir. 2016) (rejecting constructions offered for the first time post-verdict).

And even if the Court were to consider Egenera's belated construction, it
is unsupported. Egenera contends that the Court should find infringement as a
matter of law based on the mere fact that "the CPUs are in fact
'programmed,'" regardless of the function of that programming. OB36. But it
cites nothing for that interpretation of the claim. OB10; OB37. Egenera's
construction would improperly render the "to establish" term superfluous by
dictating that "[t]he 'purpose' of a particular programming operation is
irrelevant," OB37—even where that operation's goal is an explicit limitation.
*See, e.g.*, *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10
(Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that
renders them void, meaningless, or superfluous.").

Because there was sufficient evidence that in UCS only the NICs—and
not the processors—are programmed *to establish* the network topology, the
Court should affirm, and it need not reach Egenera's remaining infringement
arguments.

**B.    Sufficient evidence supports the finding that UCS does not modify messages.**

Egenera next contends that the evidence compels the conclusion that UCS meets the "modify the messages" limitation.  OB38-41.  In full, this limitation requires that "messages from the plurality of computer processors to the external communication network … are received and modified by the [at] least one control node."  Appx117 (32:33-36); *accord* Appx116 (29:57-59).  Egenera's argument is that UCS's fabric interconnect (the accused "control node") modifies messages from UCS's processors by removing a string called the "VN-tag."  OB38-41.

But that view was contradicted by the evidence at trial.  Within UCS, once a processor generates a message, it goes first "to one of the VNICs."  Appx13007.  At that stage, the VNIC adds a VN-Tag.  Appx13007.  That VN-Tag "is for internal UCS purposes."  Appx13008.  So, when the message is ready to be transmitted to the external communications or storage network, the fabric interconnect "simply takes the tag off and then will transmit the message out."  Appx13008.  In other words, "[t]he message that actually goes out … is exactly the same as the message that came from the CPU."  Appx13008.  The control node never modifies the processor's original message.

A game of telephone illustrates why Egenera is wrong: Suppose Alex starts the game with the message to Brian: "Snow day tomorrow!"  Then Brian

passes the message along to Carol but adds on a bit: "Alex says snow day tomorrow!"  Carol then passes the unmodified, original message to her mother: "Snow day tomorrow!"

Is the message Carol delivers "modified" as compared to the message Alex sent?  No.  Carol perhaps modified *Brian*'s add-on, but Carol left *Alex*'s message intact and delivered it unmodified.  This chain is analogous to what takes place inside of UCS with the VN-tag.

In short, Egenera was making the wrong comparison, looking at whether the fabric interconnect modifies the messages as they are sent by the VNICs rather than, as the claims require, as they are sent by the processors.  (I.e., it is comparing Brian's message to Carol's, rather than comparing Alex's to Carol's.)  Cisco's technical expert confirmed this mistake, demonstrating that Egenera's expert made this erroneous comparison such that Egenera's purported evidence of infringement was not tied to the claim limitation at issue.  Appx13008-13009; Appx13197-13199.

Egenera ignores this fact—that the claimed modification must be made to the messages *from the processors*—and instead contends that the modification can be made to the messages "*as they are received*" from the NICs.  OB39.  But that is impermissible rewriting of the claim, replacing "messages from the plurality of computer processors" with "messages from the plurality of NICs."

39

It is also an improper attempt to secure a belated claim construction where none was sought below.  *See supra* at 36-37.

There is no trick here with respect to extra steps, as Egenera suggests. *See* OB39-40 (citing *Smith & Nephew, Inc. v. Ethicon, Inc.*, 276 F.3d 1304, 1311 (Fed. Cir. 2001)).  The question is solely whether the actual language of the claim is satisfied.  Here, because the fabric interconnect does not modify the "messages *from the plurality of computer processors*," Appx116 (29:53-54) (emphasis added)—because Carol delivers an identical and unmodified copy of Alex's message—there is no infringement.

Because there was sufficient evidence that the control node modifies messages as (already) modified by and received from the NICs—leaving intact the messages actually sent from the processors—this Court should affirm and, as before, need not reach Egenera's remaining infringement argument.

## C.    Sufficient evidence supports the finding that UCS does not identify and extract addresses.

Egenera last argues that there was insufficient evidence to support the jury's finding that UCS does not satisfy the "addresses" limitation.  OB41-45. That limitation requires that "the at least one control node receives … storage messages from said corresponding set of computer processors, a[nd] wherein the at least one control node extracts a[n] address from a received storage

message, [and] identifies the defined corresponding address in the external storage address space."  Appx117 (32:39-45); *accord* Appx116 (30:13-19).

Sufficient evidence supported the jury's finding that the "addresses" limitation was not met because Egenera never identified any such address in the first place.  On appeal, the only supposed addresses Egenera identifies are two tags called VLAN ID and VSAN ID.  OB43.

The jury heard evidence that VLAN ID and VSAN ID are not addresses; they are tags.  Appx12987 ("[A]re those addresses?  No.").  The evidence is overwhelming on this point.  Egenera has never identified an ounce of testimony or a single document describing these tags as addresses.[5]  *See* Appx12989-12990.  Multiple witnesses referred to VLAN ID and VSAN ID as tags—not addresses.  Appx12237; Appx12987.  That testimony alone forecloses Egenera's challenge to the verdict.  *See CommScope Techs. LLC*, 10 F.4th at 1300.

Even Egenera's expert Dr. Jones could not bring himself to call VLAN ID and VSAN ID addresses, offering only the carefully worded opinion that they "act as addresses."  Appx12676.  The jury was entitled to credit the

---

[5] Egenera's reliance on *Zenith* gets it nowhere.  OB44 (citing *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994)).  Cisco is not arguing that infringement must be proved by reference to BladeFrame or BladeFrame documentation—just that no documentary evidence from any source characterizes VLAN ID and VSAN ID as addresses.

undisputed testimony that these tags are not addresses and are, therefore, not infringing.

On the basis of that "act as addresses" snippet of testimony, Egenera contends that UCS must at least have infringed under the doctrine of equivalents, OB45 (citing *UCB, Inc. v. Watson Labs., Inc.*, 927 F.3d 1272, 1284 (Fed. Cir. 2019)), an argument with which the jury squarely disagreed, Appx12012. The jury was entitled to reject Dr. Jones's "acting as" testimony. It could instead have credited Cisco's evidence that the VLAN ID is not used to make "routing" or "forwarding" decisions—the quintessential traits of an address—and, therefore, does not "act as" and is not equivalent to an address. Appx12987-12988; Appx14902-14903. This conclusion is a straightforward application of the plain meaning of "address"; it does not involve a "belated claim construction" as Egenera contends. OB44 (citing *Wi-LAN*, 811 F.3d at 465).

Egenera's pointing to the VLAN ID tag was also rebutted by Cisco's testimony that a message's address is an entirely separate field. As Cisco's expert Dr. Jeffay explained, the address is contained in the distinct D_ID field. That field indicates "the addresses of the destination," i.e., "where is this fiber channel packet going to, which particular node in the storage network." Appx12992. (The D_ID field does not satisfy the "addresses" limitation—and

42

Egenera does not contend so—because it is not translated as required by that limitation. *See* Appx12992-12993.)  In other words, the messages have an address—it is just not the VLAN ID or VSAN ID tags Egenera accused, and those tags therefore do not infringe.

### D.    Egenera failed to identify structures corresponding to claim 3's means-plus-function limitations.

The Court can affirm the jury's verdict as to claim 3 on the independent basis that Egenera failed at trial—and has again failed on appeal—to identify the structures corresponding to each of claim 3's four means-plus-function limitations.  *See* Appx1259 (construing the means-plus-function claims).  Indeed, at trial Egenera did not even try to persuade the jury on this front:  Its closing argument did not mention "structure" or "function" at all.

On appeal, Egenera again does not try.  Instead, it flips the burden, contending that because Cisco did not specifically ask the jury to find non-infringement on means-plus-function grounds, "the record is void of any suggestion that the jury could have reached its noninfringement finding on that basis."  OB41.  But it was Egenera's burden to prove infringement by showing an infringing structure, *e.g.*, *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006), and the district court properly instructed the jury on that burden and on what it needed to find in order for the means-plus-function claims to be infringed, Appx15032; Appx15043-15051.  Of course, the

jury rejected that proposition. Appx12012-12016. To the extent Cisco had any burden to do so—and it did not—Cisco and its expert squarely put the means-plus-function limitations into dispute. *See* Appx13003-13004.

## III. The District Court Correctly Denied a New Trial.

Egenera first argues that the weight of the evidence undercuts the jury's verdict, and it then offers a grab-bag of waived evidentiary and instructional arguments (OB46-58), none of which demonstrate error at all.

A district court's waiver determination is itself entitled to substantial deference. *See, e.g.*, *Bennett v. City of Holyoke*, 362 F.3d 1, 5 (1st Cir. 2004) (reviewing for abuse of discretion). In order for this Court to rule for Egenera on its waived challenges, Egenera would have to show *first* that the district court abused its discretion in determining there was waiver, *id.*, then *second* that the district court erred on the merits of the challenged issue.[6] Egenera cannot overcome either of these significant obstacles—much less both of them—for any of its waived issues.

---

[6] Even if this Court determines that Egenera's objections were forfeited, rather than waived, "[t]h[e] standard" for reviving a forfeited argument "is high, and 'it is rare indeed for a panel to find plain error in a civil case.'" *Thomas & Betts Corp. v. New Albertson's, Inc.*, 915 F.3d 36, 52 (1st Cir. 2019) (quoting *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 36 (1st Cir. 2006)).

**A.    The district court did not abuse its discretion in denying a new trial based on the weight of the evidence.**

Egenera argues that a new trial should be granted because the weight of the evidence favored a verdict of infringement on claims 3 and 7 of the '430 patent.  OB46-47.  But "in reviewing the denial of a motion for a new trial, to the extent it is predicated on a challenge to the sufficiency of the evidence," that appellate inquiry "merge[s]" with the sufficiency inquiry applicable to a motion for judgment as a matter of law, discussed above.  *Dimanche v. Mass. Bay Transp. Auth.*, 893 F.3d 1, 8 n.9 (1st Cir. 2018).  In other words, the new trial and sufficiency of the evidence challenges stand or fall together.  In addition, the First Circuit "will not intervene unless [it] ascertain[s] that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice."  *Frappier*, 750 F.3d at 99.

In support of its weight argument, Egenera suggests Cisco "sought to confuse the jury by drawing distinctions between its product and Egenera's BladeFrame."  OB47.  But Egenera never explains how this argument is relevant to a challenge to the weight of the evidence, which concerns the balancing of the parties' evidence—not the phrasing of their questions or arguments.  Moreover, Egenera invited the distinctions it now challenges: Egenera put the UCS–BladeFrame comparison before the jury when it repeatedly accused Cisco of copying the BladeFrame.  *See* Appx12103-12104

45

(opening statement) ("Cisco took what it learned from Egenera and copied it. Cisco also poached dozens of engineers and employees from Egenera to help it copy Egenera's product."); Appx12118 ("Cisco decided to build a copycat product."); Appx12123 (similar).

Cisco's questions and arguments were a direct response to Egenera's statements at trial. For example, when questioning its expert Dr. Jeffay, Cisco's counsel noted, "I think we've got to start with copying because that's what Egenera's been saying this whole case." Appx12911; *see also* Appx14669 (Cisco's counsel noting to Egenera's witness, "We've been showing, and what I referred to in my opening, was the revenue of the BladeFrame because we're accused of copying BladeFrame, and bedrock fact number one is about the demise of BladeFrame.").

Egenera never attempts to meet the clear-weight and miscarriage-of-justice standard. Instead, Egenera repeats the conclusory argument that its evidence was "substantial [and] unrebutted." OB46. And for all the reasons described above, Egenera's infringement evidence was instead nonexistent or refuted. The district court therefore did not abuse its discretion in denying a new trial on that basis.

**B.** **The district court did not err in denying a new trial based on the jury instructions.**

Asserting that instructional errors require a new trial, Egenera next argues that the district court erred by failing to provide a curative instruction based on comments the judge made during voir dire. OB47-49. Egenera also argues that the district court erred by refusing to provide the jury with Egenera's preferred separate patentability instruction. OB50-52. These arguments are untimely, and neither has merit.

**1.** **The district court did not abuse its discretion in rejecting Egenera's untimely request for a curative instruction on infringement.**

During voir dire, the district judge provided a very brief overview of the subject matter of the case. It explained that it would give a "just very brief[]" background description of the case and claims so that the voir dire questions "make sense to [the jury]." Appx13444. "This is going to be brief, nothing like the full explanation you are going to be getting shortly from the lawyers themselves, but I think it will be enough for you to get the basic idea of the case." Appx13444. As part of that overview, the district court told the jury pool—prior to empanelment—that to "'infringe' in the patent context means to copy essentially without permission." Appx13444. On that same first day, after the jury was empaneled, the district court played the Federal Judicial

Center's "The Patent Process: An Overview for Jurors,"[7] which explained to the jury that infringement occurs when a defendant "use[s] the invention without permission," without any reference to copying. *See* Appx12092.

Egenera said nothing for the next nine days of trial. At 1:28 a.m. on the last day of testimony and one trial day before the judge would give the Final Jury Instructions, Egenera sought a curative instruction. Appx11814-11819. Egenera asked the Court to instruct the jury that "you do not need to determine whether Cisco copied the patented technology to determine whether Cisco directly infringes the '430 patent." Appx11816.

Egenera waited too long to request a curative instruction, and such an instruction was not warranted in any case. The district court's purportedly objectionable comment was made to the venire before the jury was even empaneled. *See Garcia v. Peery*, No. EDCV 12-01641-JGB, 2015 WL 5159279, at *9 (C.D. Cal. July 8, 2015) (court's brief improper comments during voir dire did not violate petitioner's right to fair trial where court correctly instructed the jury at beginning and end of trial); *Vasquez v. Frauenheim*, No. 2:13-cv-01497-JKS, 2014 WL 4249676, at *5 (E.D. Cal. Aug. 26, 2014) (same). Egenera did not object at the time, presumably because it planned to put on a

---

[7] https://www.youtube.com/watch?v=ax7QHQTbKQE

copying case against Cisco. *See supra* at 45-46 (describing Egenera's copying allegations).

It was not an abuse of discretion for the district court to deny a curative instruction in this posture. A curative instruction should not "randomly be given" based on "an isolated comment, when the request for such an instruction comes … shortly before the end of the evidence." *United States v. Amador-Huggins,* 799 F.3d 124, 131-32 (1st Cir. 2015). Moreover, doing so "out of context may well have highlighted the objected-to [comment] as having more significance than it actually possessed." *Id.* And the district court provided an undisputedly correct description of infringement in its final jury instructions. *See* Appx15047-15051. The district court therefore did not err in properly instructing the jury on the law of infringement and refusing Egenera's additional requested language.

### 2. The district court did not err in refusing Egenera's instruction on separate patentability.

Egenera asserts the trial court erred by refusing to instruct the jury "that a patented product can still infringe another patent." OB50. But Egenera's argument fails twice over. First, it is not error to refuse an instruction on separate patentability, even where a defendant's own patents are introduced at trial. Second, Egenera was not prejudiced by that refusal.

Egenera has failed to show that its proposed instruction was legally required in response to the introduction of Cisco's own patents. It does not cite a single case for that proposition; indeed, it does not identify *any* case in which such an instruction was given, much less required. It is not: The district court correctly and adequately instructed the jury on the law of infringement, explaining that "a claim covers a product or method where each of the claim elements or limitations is present in that product or method, even if that product or method contains additional elements not listed in the claim," Appx15042. In other words, to the extent the jury was told that Cisco had its own patents on additional features of UCS, there was no suggestion or instruction that this could defeat infringement; the jury was told exclusively to compare the claims and the accused product without regard to additional features.

That was all the district court was obligated to do. *See United States v. McGill*, 953 F.2d 10, 12 (1st Cir. 1992) ("So long as the charge sufficiently conveys the defendant's theory, it need not parrot the exact language that the defendant prefers."); *Elliott v. S.D. Warren Co.*, 134 F.3d 1, 6 (1st Cir. 1998) (holding that, although district court did not use the term a party preferred, "it adequately instructed the jurors" regarding the law); *Torres v. KMart Corp.*, 233 F. Supp. 2d 273, 283-84 (D.P.R. 2002) (finding duplicative instructions

unnecessary where district court "already covered [the issue] by the instructions given.").

Even if the district court erred in refusing Egenera's proposed instruction, Egenera suffered no prejudice. The district court was "clear that [UCS] would infringe [Egenera's] patent if [it] fell within [the asserted] claim[s]." *NFA Corp. v. Asheboro Elastics Corp.*, 230 F.3d 1377, 2000 WL 6217, at *4 (Fed. Cir. 2000) (non-precedential). "These clear statements of the law were sufficient to dispel any misconceived notions that [Cisco] was somehow shielded from liability by the existence of its own patents." *Id.*

Egenera cannot meet the First Circuit's demanding standard for prejudice. *See supra* at 25. It does not even address it. *See* OB50-52. Applying that law, Egenera's proposed instruction was not "integral to an important point in the case," *United States v. DeStefano*, 59 F.3d 1, 2 (1st Cir. 1995), and did not "affect[] the result of the jury's deliberations." *Ji v. Bose Corp.*, 626 F.3d 116, 126 (1st Cir. 2010). Egenera identifies but five pages of relevant testimony. OB50-51. As is clear from that scarce evidence, Cisco used its patents to refute Egenera's arguments that the '430 patent was the "essence of the UCS" and to defend against Egenera's willfulness and copying allegations—not infringement. *See* Appx14443 (Dr. Jones). Even during its

closing statement, Cisco was rebutting Egenera's allegations: "We have our own patents on it. The idea that we copied is nonsense." Appx14976.

In one instance that Egenera cites, Cisco indeed referred to its patented VN-tag technology, OB51 (citing Dr. Jeffay's testimony at Appx13008-13010), but that was merely background information about the accused UCS technology, elicited in just a page of testimony from Cisco's technical expert. The expert was explaining as a general matter how VN-tags work. Following just three questions on Cisco's VN-tag patents, counsel for Cisco then expressly noted that he was "switch[ing] gears" from Cisco's patents to discuss infringement instead. Appx13011. In sum, Cisco's use of its patents was not directed to infringement and was not integral to Egenera's infringement allegations.

Egenera tries to dodge the issue by pointing to the "distraction of Cisco's irrelevant patents," OB52, and citing a case affirming the exclusion of such patents, OB50 (citing *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564 (Fed. Cir. 1986)). But Egenera is not challenging the admission of Cisco's patents on appeal. It hardly could: It did not object at trial to admission of the patents, nor to Cisco's references to them during closing arguments. *See, e.g.*, Appx13010-13011. So *Glaros* and Egenera's related argument are beside the point. Moreover, Egenera's failure to object to the patents and argument

underscores the lack of prejudice: If Cisco's patents risked affecting the result of the jury's deliberations, Egenera would have objected to their admission.

Because the district court correctly instructed the jury on the law of infringement, it did not err in refusing Egenera's additional proposed language, and Egenera was not prejudiced in any case. This issue provides no basis for a new trial.

### C. The district court did not abuse its discretion in denying a new trial based on Cisco's lay opinion testimony.

Egenera challenges the district court's admission of testimony from two of Cisco's lay witnesses, Mr. Dvorkin and Mr. Jayakrishnan.

As Cisco's UCS Manager, Mr. Dvorkin "manage[d] the UCS system, which means … programming the network adapters and programming the fabric interconnect." Appx14543. He "was one of [UCS's] core architects." Appx14543; *see also* Appx12840-12842.

Mr. Jayakrishnan, Cisco's Vice President of Engineering and corporate representative, testified that he was "responsible for all of UCS engineering" and has "responsibility over the entire UCS product line." Appx12857. Over the course of his career, Mr. Jayakrishnan spent "thousands of hours" writing and reviewing UCS source code. Appx12858.

Egenera asserts that the testimony from these witnesses was improper because they acted as "surprise expert witnesses." OB21. As the district court

found, Egenera did not properly object to this testimony at trial, and in any

event neither witness provided improper testimony that prejudiced Egenera.

Appx81.  Both witnesses were uniquely qualified to "explain how" Cisco's

UCS system was "designed [and] how it's different from the Egenera

approach."  Appx14525.

> **1.    The district court did not abuse its discretion in finding that Egenera's objections to Cisco's lay opinion testimony are waived.**

Egenera never objected to the testimony of Mr. Dvorkin and Mr.

Jayakrishnan at trial.  After trial, the district court held that it was too late to

object—the jury having ruled—and it therefore correctly found that Egenera's

argument was waived.  Appx81.

An objection to the admission of evidence has to be "timely" made by

the party opposing admission.  Fed. R. Evid. 103(a)(1); *Shepp v. Uehlinger,* 775

F.2d 452, 454 (1st Cir. 1985); *Reagan v. Brock*, 628 F.2d 721, 723 (1st Cir.

1980).  An objection is timely when it is made "'at the earliest possible

opportunity when, by so doing [it] can enable the trial judge to take the most

efficacious action.'"  *Saville v. United States*, 400 F.2d 397, 400 (1st Cir. 1968)

(quoting *Holden v. United States*, 388 F.2d 240, 242-43 (1st Cir. 1968)).

Here, Egenera's "earliest possible opportunity" to object was at trial, not

in a post-trial motion after the jury had already ruled.  At no time during trial

did Egenera object to any instance of "Mr. Dvorkin and Mr. Jayakrishnan …

provid[ing] detailed non-infringement opinion testimony that 'confuse[d] the

jury into concluding that the testimony was relevant to the issue[] of

infringement.'"  OB54 (quoting *Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d

1337, 1353 (Fed. Cir. 2019)).  Egenera's objection is therefore waived.

Egenera points to two supposed "objections" that it suggests preserved

this argument for appeal.  OB54.  Neither suffices.

Egenera first points to a mid-trial motion filed to prohibit Mr.

Jayakrishnan from "offering testimony or argument" regarding a specific

demonstrative exhibit used during Dr. Jones's testimony "to support his

infringement opinions."  Appx11775.  The district court correctly denied that

narrow motion because it was untimely even then.  *See* Appx173 (denying

Egenera's motion to exclude "as the objection was not raised within the

prescribed time agreed upon by the parties.").

The district court also determined that Egenera opened the door to the

challenged testimony through Egenera's questioning of Mr. Jayakrishnan.

Appx12776.  Exactly so: "An objection to the admission of evidence is …

waived if the evidence was first elicited by the party now objecting."  *Willco*

*Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 625 (1st Cir. 1988).  Egenera

asked Mr. Jayakrishnan to "list" "any reasons that [he] contend[s] Cisco does

not infringe claims 3 or 7 of the '430 patent."  Appx12608.  Given Egenera's

direct solicitation of Mr. Jayakrishnan's lay opinions on the differences

between the UCS and the patent, Appx12553-12559, it cannot now complain

that Mr. Jayakrishnan testified to the very infringement opinions Egenera

elicited.

Egenera next cites a Rule 702 objection during Mr. Dvorkin's testimony.

OB54 (citing Appx12816).  This objection is also insufficient to overcome

waiver of the issue raised on appeal.  Egenera objected to Cisco's counsel

asking Mr. Dvorkin whether the approach to programming network topology

that he used at a prior company was the same as the approach used by Cisco.

Appx12815-12816.  Not only was this not improper opinion testimony

(because Mr. Dvorkin was testifying about his own experience with product

development), but it is not the testimony Egenera complains about now.

Mr. Dvorkin was not comparing the accused UCS product with *either* the

'430 patent *or* Egenera's products—the comparisons now challenged on

appeal.  Egenera's single objection (to an entirely different line of questioning)

cannot preserve the distinct argument Egenera now makes on appeal.  OB20-

23.

To the extent Egenera suggests, at OB57, that its broad motion in limine

to preclude "lay witness opinion testimony attempting to opine on non-

infringement of the accused products or otherwise comparing the accused products to the patent specification or claims," Appx10942, is sufficient to preserve its objection here, that argument also fails.  The district court denied that motion, ruling that "the opinion testimony [of Cisco's two lay witnesses] is relevant to intent and knowledge for purposes of defending the willful infringement and indirect infringement claims" under *Omega,* 920 F.3d 1337. Appx165.  "Where an objection to evidence has been overruled in limine, it makes sense to require that the objection be renewed at trial.  However definite the denial of the motion to exclude prior to trial, it is child's play for the opponent of the evidence to renew the objection when the evidence is actually offered."  *Fusco v. Gen. Motors Corp.,* 11 F.3d 259, 262 (1st Cir. 1993).

If Egenera believed that Cisco's witnesses were testifying beyond the scope of what was permissible under *Omega*, and therefore beyond the scope of what was allowed by the district court's denial of its motion in limine, it was obligated to object at the time.  "[R]equiring this renewal gives the trial judge a chance to reconsider the ruling with the concrete evidence presented in the actual context of the trial."  *Id.*  Egenera never flagged for the district court that any of Mr. Dvorkin's or Mr. Jayakrishnan's testimony exceeded the scope of what it thought was allowed under the court's ruling.  It has missed its chance.

57

Egenera cites *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) and *Crowe v. Bolduc*, 334 F.3d 124 (1st Cir. 2003) for the premise that a final in limine ruling preserves the issue for appeal.  OB57.  Those cases are inapposite.

In *Uniloc*, the district court held that Microsoft's arguments "fell into" the limited "exception" to Rule 103(a), and the Federal Circuit would not "second-guess the district court's explicit recognition of Microsoft's objections to Gemini's testimony."  632 F.3d at 1319.  In other words, the district court found the objection preserved, and the Federal Circuit accepted that finding. Here, by contrast, the district court determined that Egenera "waived this argument by failing to raise any relevant objection during the examination of either witness," Appx81, and there is no basis for this Court to reverse that finding under the deferential abuse-of-discretion standard.

In *Crowe*, the First Circuit held that it was the movant's burden to determine whether an in limine ruling was final for preservation purposes. Here, "[t]he court did not authorize the witnesses to offer expert opinions, so the burden was on Egenera to lodge an *Omega* objection at the appropriate time."  Appx81 n.3.  Egenera did not and cannot satisfy its burdens under *Crowe*.

58

### 2.    Egenera's objection to Cisco's lay opinion testimony is meritless.

Even if not waived, Egenera's complaint that "Cisco … elicited expansive non-infringement opinions from two Cisco lay witnesses," OB20, is meritless.

As to Mr. Jayakrishnan, *Egenera* asked for his infringement opinions. Egenera called Mr. Jayakrishnan as an adverse witness and proceeded to ask him to list "any reasons that you contend Cisco does not infringe claims 3 or 7 of the '430 patent" so that their expert would have "the opportunity to address" Mr. Jayakrishnan's "views" of non-infringement.  Appx12608.  *See generally* Appx12608-12611 (Mr. Jayakrishnan explaining how UCS differs from the asserted claims).  Egenera's solicitation of the testimony it now complains of is clear.

Tellingly, Egenera does not cite this testimony in its opening brief, and it instead focuses on instances of Cisco's witnesses disagreeing with characterizations of the facts by Egenera's experts.  *See* OB20-23.  But a lay witness's disagreement with an expert witness's characterization of the facts does not transform that lay testimony into improper expert testimony. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 371 (7th Cir. 2017) (lay witnesses "may testify regarding 'facts that may contradict

the facts underlying … experts' opinions.'"). Cisco's witnesses offered their own versions of the facts based on their lived experiences.

Moreover, the district court allowed Cisco's witnesses to offer opinion testimony "relevant to intent and knowledge for purposes of defending the willful infringement and indirect infringement claims." Appx165. Because both Mr. Dvorkin and Mr. Jayakrishnan had management authority over, and detailed personal technical knowledge of, the accused products, their testimony refuting Egenera's willfulness and indirect infringement allegations was factual and permissible. *Omega,* 920 F.3d at 1351-52.

To the extent that any of the testimony Egenera complains about is fairly characterized as opinion testimony, it falls within the scope of permissible lay opinion testimony under Federal Rule of Evidence 701 as "testimony based on the lay expertise a witness personally acquires through experience, often on the job." *United States v. Belanger*, 890 F.3d 13, 25 (1st Cir. 2018) (citing Fed. R. Evid. 701); *see also Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692-93 (Fed. Cir. 2001) (allowing lay witness testimony regarding enablement because the witnesses had "extensive personal experience in the oil drilling industry" and they "testified based on" those "personal experiences"). For example, Mr. Dvorkin contradicted Egenera's expert's testimony that "UCS Manager programmed server CPUs to establish network topology" because he

"was there" when "we programmed the interface card." Appx14543. He likewise testified that "as the designer of UCS Manager," it was "true … that UCS operates differently from Egenera's patent." Appx14545. Egenera's challenge under Rule 702 fails because the challenged testimony was properly admitted under Rule 701.

### 3.    Egenera was not prejudiced by Cisco's lay opinion testimony.

Egenera also cannot demonstrate that it was prejudiced. To obtain relief, Egenera must show that any error "is likely to alter the outcome, and … is sufficiently fundamental to threaten the fairness or integrity or public reputation of the judicial process." *Ji*, 626 F.3d at 126 (citation and internal quotation marks omitted). Egenera cannot make that showing.

Egenera had a full and fair opportunity to respond to Cisco's witnesses. It called Mr. Jayakrishnan in its case-in-chief, and then Egenera's expert, Dr. Jones, twice had the opportunity to respond to both Mr. Jayakrishnan's and Mr. Dvorkin's testimony during his direct and rebuttal examinations. *See, e.g.,* Appx12608 (explicitly asking Mr. Jayakrishnan for his non-infringement opinions so that Dr. Jones "has the opportunity to address any views [Mr. Jayakrishnan] ha[s] on the subject"); Appx12705 (Dr. Jones responding to Mr. Jayakrishnan's testimony); Appx12717-12723 (same); *see also* OB22 ("Mr. Jayakrishnan's opinion testimony mirrored … that of Mr. Dvorkin."). And

again, it was Egenera itself that "opened the door to the testimony of Mr. Jayakrishnan by asking him about the '430 patent" and, specifically, about his views on infringement. Appx81-82. Egenera cannot now complain it was prejudiced by a line of testimony it "first elicited." *Willco*, 843 F.2d at 625.

### D. The district court did not abuse its discretion in denying a new trial based on Cisco's closing arguments.

#### 1. The district court did not abuse its discretion in finding that Egenera's objections to Cisco's closing arguments are waived.

Egenera last complains that Cisco's closing arguments violated the district court's in limine orders. OB24-28, 52-54. Here again, Egenera never objected during trial and instead objected for the first time in posttrial briefing. *See* Appx13413-13418. But Egenera's "failure to object to the argument[s] at trial or to move for a mistrial bars it from urging the improper argument as grounds for a new trial after the jury had returned its verdict." *Comput. Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir. 1984). The district court properly determined that Egenera "fail[ed] to object to the alleged improper arguments." Appx79. And Egenera offers no reason to disagree with that determination on appeal. Appx79.

### 2. Egenera's objections to Cisco's closing arguments are meritless.

The court's orders in limine are subject to a substantial level of deference, *see United States v. Gilbert*, 229 F.3d 15, 17 (1st Cir. 2000), and should not be disturbed absent an abuse of discretion, *IDC Properties, Inc. v. Chicago Title Ins.*, 42 F.4th 1, 12 (1st Cir. 2022).

*"Empty chair" arguments.* Egenera accuses Cisco of violating an order that prohibited the parties from making empty-chair arguments, i.e., by referring "to the absence of any witnesses who do not appear at trial." Appx169. This is open-and-shut: The witness in question, Mr. Thompson, *did* appear at trial, *see* Appx80, testifying by deposition as part of Cisco's defense case, Appx173; *see also* Appx12087-12088 (instructing that deposition testimony is "considered … just as if the witness had appeared here in court to testify"); Fed. R. Civ. P. 32(a)(4) (allowing use of deposition testimony at trial when the witness is "unavailable"). The chair was not empty; the order therefore does not apply.

Egenera also accuses Cisco of "leverag[ing] the empty chair to leave the jury with the false impression that Egenera no longer has employees." OB26. But Cisco's statements at closing were all about a lack of evidence regarding Egenera's current business practices, not about the absence of employees. *See* Appx14986 ("What do you know about Egenera today? Nothing.");

63

Appx14987 ("No one testified about Egenera today.").  The court's order did
not prohibit the parties from discussing what the other side did not prove; it
only prohibited the parties from speculating about why a party did not call a
particular witness.  In fact, the district court *explicitly* authorized each party to
"introduce evidence regarding its own business and the business of the other
party."  Appx80.

*Litigation-finance order.*  Egenera next accuses Cisco of violating the
district court's litigation-finance order, which Egenera "sought for the specific
purpose of preventing Cisco from improperly suggesting that 'Egenera's patent
infringement claim is predatory or lacks merit, or that Egenera should not
otherwise be entitled to meaningful damages or other relief.'"  OB26 (citing
Appx11562).  But Egenera's motion, and, consequently, the district court's
order were limited "to exclud[ing] references to the parties' ability to finance
*the current litigation*."  Appx166 (emphasis added); *see also* Appx11562 (arguing
that Cisco should not be allowed to "introduce at trial evidence or argument
that Egenera has used litigation funders or funds from private equity funders to
finance the present litigation").

None of the quotations Egenera cherry picks from Cisco's closing
argument have anything to do with litigation funding.  For example, Egenera
points to Cisco's characterization of Egenera's *investors* as "venture capitalists

… who put money in Egenera" and are "taking one last attempt to make some money on that bet." Appx14987.  But that statement says nothing about Egenera's ability to fund this "current litigation," which is the only argument the court prohibited in granting Egenera's motion in limine.  *See* Appx14988 (similarly silent regarding litigation funding); Appx14987 (same).  That a particular investor funded the company from the beginning, and stands to gain from an infringement ruling, says nothing about Egenera's ability to finance the litigation.

*Anheuser-Busch, Inc. v. National Beverage Distributors* does not hold otherwise.  69 F.3d 337 (9th Cir. 1995).  In that case, the district court "ruled unambiguously that evidence relating to prospective purchasers of [the] distributorship … was inadmissible." *Id.* at 346.  Yet at trial, the defendant presented "evidence that prospective purchasers had contacted her." *Id.*  That testimony, unlike here, was directly within the scope of the court's ruling on the motion in limine.  Here, the subject testimony has nothing to do with the court's ruling.

*Egenera as a non-practicing entity.*  Egenera next alleges that Cisco violated the district court's order prohibiting Cisco from referring to Egenera as a "non-practicing entity" or a "patent troll."  OB27.  But Egenera cannot point to a single instance of Cisco using either of those terms at any point during trial,

and it instead complains that Cisco "attempted to sway the jury by *implying*," OB52 (emphasis added), and "*effectively* characterizing" Egenera as a non-practicing entity, OB27 (emphasis added). Cisco never disputed that Egenera's BladeFrame practiced the '430 patent—i.e., it agreed that Egenera was a practicing entity in that respect—which forecloses any insinuation that Cisco characterized Egenera as a non-practicing entity. Cisco *did* point out that the BladeFrame is no longer on the market, but that was to support its argument that the BladeFrame "didn't succeed … because of their design [and] what's in their patent," Appx12143, and not to suggest that Egenera was a "non-practicing entity." Egenera's witnesses repeatedly testified that it pivoted to software sales after the decline of the BladeFrame, so it was not prejudiced by Cisco's (accurate) observation that just one of its products (the hardware BladeFrame) had failed in the market. *See, e.g.*, Appx14671-14673.

*Non-practicing entities bring baseless claims.* Egenera also contends that Cisco violated a related order against "any arguments … that non-practicing entities bring baseless claims." OB27 (citing Appx168). But given Cisco's silence regarding non-practicing entities, Cisco could not have suggested that non-practicing entities bring baseless claims. Cisco of course suggested that *Egenera* brought a baseless claim; that was the whole point of its noninfringement defense. But Cisco never argued that non-practicing entities

as an industry bring baseless claims, nor did it ever solicit any testimony about non-practicing entities.

### 3.    Egenera was not prejudiced by Cisco's closing arguments.

In any event, no new trial would be warranted because Cisco presented extensive evidence of noninfringement, which was the only issue the jury reached. Egenera's "empty chair," non-practicing entity, and litigation funding accusations—even if taken at face value—are only arguably relevant to damages, an issue the jury never reached. Even accepting Egenera's characterization of each of these arguments, none of them are relevant to infringement and thus could not have affected the ultimate verdict. Egenera's "empty chair," non-practicing entity, and litigation funding accusations—even if taken at face value—are only arguably relevant to damages, an issue the jury never reached. Egenera cannot demonstrate a "miscarriage of justice" entitling it to a new trial. *Ramos v. Davis & Geck, Inc.,* 167 F.3d 727, 731 (1st Cir. 1999).

This case is nothing like those Egenera highlights. For example, *Polansky v. CNA Insurance* involved an attorney who repeatedly (over multiple objections and a motion for mistrial) injected "counsel's opinions or personal beliefs" about why an insurance company did not pay claims involving multiple deaths, even though motive for nonpayment was irrelevant to the issues before the jury. 852 F.2d 626, 628 (1st Cir. 1988). Likewise, in *Commil*

*USA, LLC v. Cisco Systems, Inc.,* this Court affirmed the grant of a new trial where counsel for the defendant continued to make "inflammatory statements" regarding ethnicity and religion "even after the court warned counsel and issued a curative instruction." 720 F.3d 1361, 1370 (Fed. Cir. 2013), *vacated on other grounds*, 575 U.S. 632 (2015). If anything, these cases hammer home the lack of prejudice by demonstrating how out-of-bounds trial conduct must veer to warrant a district court's intervention.

The district court did not abuse its discretion in denying a new trial based on the comments identified by Egenera.

## CONCLUSION

Cisco respectfully requests that the Court affirm the verdict and judgment of the district court.

Respectfully submitted,

/s/ Mark S. Davies

Tamir Packin                         Mark S. Davies
John M. Desmarais                    Upnit Bhatti
DESMARAIS LLP                        Katherine M. Kopp
230 Park Avenue                      ORRICK, HERRINGTON &
New York, NY  10169                      SUTCLIFFE LLP
                                     1152 15th Street, NW
Elizabeth R. Moulton                 Washington, DC  20005
ORRICK, HERRINGTON &                 (202) 339-8400
    SUTCLIFFE LLP
405 Howard Street                    James Anglin Flynn
San Francisco, CA  94105             ORRICK, HERRINGTON &
                                         SUTCLIFFE LLP
                                     222 Berkeley Street
                                     Boston, MA  02116

*Counsel for Appellee*

August 3, 2023

## CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 13,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Calisto MT 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Mark S. Davies*
Mark S. Davies
*Counsel for Appellee*